## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

---

PHL VARIABLE INSURANCE
COMPANY,

               Plaintiff,

                    v.

BANK OF UTAH, as Securities Intermediary

               Defendant.

CASE NO.:

---

## COMPLAINT

Plaintiff PHL Variable Insurance Company ("Phoenix"), by and through its attorneys, files this Complaint against the Bank of Utah, as Securities Intermediary ("Bank of Utah"), as follows:

1.     This is an action for Declaratory Judgment under 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Phoenix seeks to adjudicate its rights and obligations under a policy of life insurance bearing the number 97523816 (the "Policy") insuring the life of William Close ("Mr. Close"), who is now deceased. Specifically, Phoenix seeks a declaration that the Policy is null and void *ab initio* due to the lack of an insurable interest at the Policy's issuance.

2.     As explained in greater detail below, Mr. Close, with the assistance of others, executed a plan, scheme and/or design intended to procure a life insurance policy on Mr. Close's life for the purpose of selling it on the secondary market.  In applying to Phoenix for this insurance, Mr. Close and the William Close 2007 Irrevocable Trust

("Close Trust"), by and through its trustee, BNC National Bank ("BNC") made numerous misrepresentations concerning Mr. Close's net worth and income, bona fide need for the insurance sought, and whether third-party investors would obtain any rights or interest in the applied-for policy.  Additionally, the Close Trust was created in order to disguise the illicit nature of this transaction and create the false perception that the Policy was purchased for legitimate insurance purposes.  The Policy however, was not sought by Mr. Close to meet his legitimate insurance needs, but instead was sought by, and intended for the benefit of, investors who were complete strangers to Mr. Close and who lacked a legally cognizable insurable interest in his life.

3.      Because the Policy lacked an insurable interest at its inception, it is null and void *ab initio*, and no death benefits are payable under the Policy.  As such, there is an actual controversy of a justiciable nature concerning the rights and obligations of the parties under the Policy.

## THE PARTIES

4.      PHL Variable Insurance Company is a Connecticut insurance company authorized to transact the business of insurance in Delaware.  Phoenix is organized under the laws of Connecticut with its principal place of business in Hartford, Connecticut. Phoenix's headquarters are located at One American Row, Hartford, CT 06102–5056. Phoenix's high level officers direct, control and coordinate the corporation's activities from Hartford, Connecticut.  As such, Phoenix is a citizen of the State of Connecticut within the meaning and intent of 28 U.S.C. § 1332.

5.      The Bank of Utah is a banking institution organized and existing under the laws of the State of Utah, with its principal place of business in Utah.  The bank may be served at 200 E. South Temple, Suite 210, Salt Lake City, Utah 84111.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over all parties of this lawsuit under 28 U.S.C. § 1332(a)(1) because Phoenix and the Bank of Utah are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of attorneys' fees, interest and costs. The Bank of Utah is subject to the personal jurisdiction of this Court.

7.      This Court has jurisdiction for the declaratory judgment action pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202, which grant the United States District Courts jurisdiction to declare the "rights and other legal relations of any interested party making such declaration, whether or not further relief is or could be sought."

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because all or a substantial portion of the events or omissions giving rise to the cause asserted herein took place in the State of Minnesota.  Bank of Utah acquired the Policy from the Close Trust, which is a Minnesota statutory trust.  Additionally, the Policy was issued in Minnesota and is governed by Minnesota law.

## FACTUAL BACKGROUND

A.      **Stranger Originated Life Insurance**

9.      In recent years, a derivative market for life insurance has developed in which existing life insurance policies and certificates are sold to third parties who lack an

insurable interest in the life of the insured. Typically referred to as a "life settlement",

these sales are generally lawful, assuming that the policy was procured for legitimate

purposes and that there was an insurable interest at the policy's inception.

10.     As this derivative market has developed however, there has been a

proliferation of life insurance policies that are not sought for legitimate insurance needs,

but rather for re-sale to strangers in the secondary market. Policies procured under these

circumstances have become known as stranger originated life insurance ("STOLI")

policies. STOLI policies are illegal wagering contracts that lack an insurable interest at

inception. As such, STOLI policies are void *ab initio*.

11.     Although the STOLI market has only recently come into existence, the

underlying concept has persisted for over a century. Indeed, in the late nineteenth and

early twentieth centuries, the United States Supreme Court opined against unlawful

"wagering contracts," and the "sinister counter interest" in the death of the insured that

results from the issuance of such policies.[1] In an effort to prevent investors from

speculating on the lives of others, many states have enacted insurable interest laws to

protect the integrity of life insurance by requiring that a policy owner have a cognizable

interest in the longevity of the insured at the time the policy is issued. However, STOLI

promoters have attempted to circumvent these laws by carefully constructing their

---

[1] *See Grisby v. Russell*, 222 U.S. 149, 154–55 (1911) (explaining that an insurance policy lacking an insurable interest at inception merely serves as a cover for a "pure wager," which contradicts the precise purpose of a life insurance policy because it "gives the [policyholder] a sinister counter interest in having the insured's life come to an end."); *Warnock v. Davis*, 104 U.S. 775, 779 (1881) (condemning wagering contracts because they "have a tendency to create a desire for the [death of the insured] and are, therefore, independently of any statute on the subject, condemned, as being against public policy.").

transactions to hide the fact that the policies are not being procured to satisfy legitimate insurance needs, but instead are being procured as impermissible wagers.

12.     In order to maximize their potential return on investment, STOLI promoters will seek out individuals aged seventy years or older who are purportedly financially qualified for high face amount insurance policies.  This in turn allows STOLI promoters to multi-million dollar life insurance policies on individuals who, actuarially speaking, are expected to have a relatively limited lifespan.  The perverse result is that the shorter life expectancy of these individuals makes them a more attractive investment to those who would gamble on the lives of these insureds.

13.     In many cases, STOLI policies are initiated with fraudulent representations during the application for insurance.  Insurers will not issue coverage unless there is a legitimate need for the insurance applied for, such as estate conservation or income replacement.  As such, insurers, in an effort to prevent issuing STOLI policies, require insurance applicants to respond to specific questions during the application process regarding the insured's net worth and income, the purpose of the insurance sought and any intent to transfer the policy.  STOLI promoters and insureds will falsely answer these questions in order to obtain the insurance sought.  Additionally, in order to maximize their profit and/or to obtain high-face amount policies insuring individuals not qualified for such policies, STOLI promoters and insureds frequently provide insurers with false information regarding an insured's financial status.

14.     In furtherance of a STOLI scheme, the Close Trust procured the Policy from Phoenix.  In doing so, STOLI promoters caused the establishment of the Close Trust

to give the false appearance that the Policy was being purchased for legitimate insurance purposes.  In fact, the Close Trust was created to act as a vehicle to circumvent applicable insurable interest laws so that the Policy could be controlled by a third-party investor that lacked an insurable interest in Mr. Close's life.  Additionally, the Trust and Mr. Close made numerous fraudulent misrepresentations relating to Mr. Close's net worth and annual income and the intent for investors to obtain an interest in the Policy.

15.     Because the Policy was fraudulently procured as a mere cover for an impermissible wagering contract, the Policy lacked a valid insurable interest at its inception and is therefore void.

16.     Had Phoenix known of the true facts concerning the application, it would not have issued the Policy.

17.     As such, Phoenix brings this action for an order declaring the Policy null and void *ab initio*.

**B.     The Procurement of the Close Policy**

      **i.     The Application for the Policy**

18.     Phoenix is, and during all relevant times has been, in the business of underwriting and issuing policies of life insurance and is authorized to transact the business of insurance in the State of Minnesota.

19.     On or about August 16, 2007, Phoenix received an application form and related documents seeking the issuance of an insurance policy with a $5 million face amount insuring Mr. Close's life.  The application form represented that the Close Trust, which was created on August 10, 2007, was the proposed owner and sole beneficiary of

the applied-for policy.  The Trust, by and through its trustee, BNC, executed the application form as the policy owner.

20.    In applying for the Policy, Mr. Close and the Close Trust provided Phoenix with material information regarding, among other things, Mr. Close's net worth and income, the purpose for insurance, and whether there was any intention that a third-party would obtain an interest in the applied-for policy.  In applying for the Policy, Mr. Close and the Close Trust knew that they were required to provide complete, accurate and honest answers to the questions presented by Phoenix.  Mr. Close and the Close Trust also knew that Phoenix would rely upon the answers given in determining whether Mr. Close was insurable and qualified for the insurance sought through the application.

21.    Mr. Close and the Close Trust, through its trustee, BNC, responded to clear, direct questions seeking material information regarding Mr. Close's net worth and annual income.  In response to these questions, it was represented that Mr. Close had a net worth of $6.675 million and other income of $350,000.  The application also represented that Mr. Close had never been convicted of a felony.  As discussed more fully in the ensuing paragraphs, these representations were false, were material to Phoenix's acceptance of the risk assumed, and were made with the intent that Phoenix rely upon them in issuing the Policy.

22.    The application form contained the following affirmation:

> I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the

7

best knowledge and belief of the undersigned and have been correctly recorded.

Mr. Close and the Close Trust, through its trustee, BNC, executed the application form on or about August 11, 2007 and August 10, 2007, respectively.  The application form represented that Mr. Close signed the application form in the state of Florida and that BNC, on behalf of the Trust, signed the application form in the state of Minnesota.

23.     Along with the application form, Mr. Close and the Close Trust, through its trustee BNC, executed a Statement of Client Intent Form (the "SOCI"), which requested material information regarding, among other things, the purpose of the insurance, whether there was any intent or understanding that a third-party would obtain an interest in the Policy and whether the insured or any related parties would receive any inducements in connection with the purchase of the Policy.  In response to the SOCI questions, Mr. Close and the Close Trust represented that the Policy was not being purchased in connection with a program under which the trust or Mr. Close had been advised of the opportunity to transfer the Policy, that there was no intent, understanding or agreement that the Policy would be sold and/or transferred to a third-party, and that neither Mr. Close nor the Trust was being paid cash or other inducement in connection with the application for the Policy.  These representations were false, were material to the risk Phoenix assumed, and were made with the intent that Phoenix rely upon them when issuing the Policy.

24.     The SOCI contained the following affirmation:

By signing below, the undersigned declare and certify that the information contained in this Statement of Client Intent is

true, correct and complete to the best of their knowledge, information and belief.

Mr. Close executed the SOCI on or about August 11, 2007 and the Close Trust, through its trustee BNC, executed the same document on or about August 10, 2007.

### ii.     The Issuance of the Close Policy

25.     On the basis of the statements and representations made during the application process, and in reliance upon Mr. Close and the Close Trust's complete candor, honesty and openness in disclosing information in response to the questions presented, Phoenix offered the Policy to the Close Trust, with a planned first year premium of $272,000, a policy date of September 11, 2007, and face amount of $5,000,000.  The Policy is governed by Minnesota law.

26.     In order to place the Policy in force, Phoenix required that it receive an executed policy acceptance form and payment of premium.  On or about September 19, 2007, the Close Trust, through its trustee, executed the policy acceptance form which represented it had been signed in Minnesota.  Phoenix subsequently received payment of premiums.

### iii.     The Transfer of the Close Policy and Death Claim

27.     On or about January 15, 2010, the ownership of the Policy was formally transferred to New Stream Insurance, LLC.  On or about May 27, 2010, the ownership of the Policy was formally transferred to Bank of Utah, as Securities Intermediary.

28.     Mr. Close passed away on November 18, 2011.  On January 6, 2012,

Phoenix received a copy of his death certificate and a Benefits Beneficiary Statement

from Bank of Utah.

C.     **Phoenix's Investigation of the Close Policy**

29.     Upon investigation, Phoenix learned that the representations made during

the application process concerning Mr. Close's net worth, income, criminal history and

whether there was any intent, understanding or agreement that a third-party would obtain

an interest in the Policy were each false.  Mr. Close and the Close Trust knew that said

representations were false, and intended that Phoenix rely on these false representations

when issuing the Policy.

30.     Contrary to the representations made during the application process, Mr.

Close did not have a net worth of $6.675 million or income of $350,000.  Mr. Close was

also a convicted felon, who served time in federal prison from 2002–2004 after pleading

guilty to twelve counts of soliciting and receiving illegal kickbacks and seven counts of

money laundering.  *See United States of America v. Close*; Case No. 1:00-CR-00288; in

the Northern District of Illinois.  Mr. Close and the Close Trust knew that Mr. Close was

a convicted felon who did not have a net worth of $6.675 million or income of $350,000

at the time they applied for the policy, but falsely made these representations to Phoenix

in order to obtain a life insurance policy for which Mr. Close was not qualified.

31.     Kathleen Close ("Ms. Close"), Mr. Close's widow, has confirmed to

Phoenix that the representations on the application regarding Mr. Close's net worth were

false.  Ms. Close informed Phoenix that Mr. Close had been approached by Brad

Friedman, who told Mr. Close that he would receive $500,000 in exchange for agreeing to be insured under the Policy.  Ms. Close stated that the sole purpose in applying for the Policy was to sell it to an investor, that they had no intent to keep the Policy, and could not have afforded the premiums on the Policy.  Indeed, without assets approaching the value described to Phoenix, Mr. Close could not afford the $272,000 first year premium payment scheduled for the Policy.

32.     Upon information and belief, Mr. Close and the Close Trust intended to sell the Policy to a third-party investor.  Mr. Close and the Close Trust made false representations to the contrary in order to obtain the Policy.

33.     Upon information and belief, Mr. Close and the Close Trust knew that there was an understanding or agreement that a party other than the Close Trust would obtain a legal or equitable right, title or interest in the Policy.  Mr. Close and the Close Trust made false representations to the contrary in order to obtain the Policy.

34.     Upon information and belief, Mr. Close and the Close Trust knew that Mr. Close or a related party or entity would receive cash or other inducement in connection with the application for and purchase of the Policy.  Mr. Close and the Close Trust made false representations to the contrary in order to obtain the Policy.

35.     Upon information and belief, Mr. Close and the Close Trust knew that the Policy was being purchased with the intent and agreement that a third-party investor, which lacked an insurable interest in Mr. Close's life, would obtain an interest in and control over the Policy.  Mr. Close and the Close Trust made false representations to the contrary in order to obtain the Policy.

36.     Had Mr. Close and the Close Trust provided Phoenix with accurate information regarding these items during the application process, Phoenix would not have issued the Policy.

37.     Phoenix has suffered damages as a result of the Close Trust's misrepresentations and fraud, including compensation paid to insurance brokers, internal costs incurred in placing, administering and servicing the Policy, and costs incurred in investigating and seeking a declaration that the Policy is void.

38.     Phoenix brings this action seeking an order that the Policy is null and void *ab initio*.

## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

39.     Phoenix incorporates herein by reference each of its allegations contained in Paragraphs 1–38 above.

40.     Pursuant to the Federal Declaratory Judgment Statute, 28 U.S.C. § 2201, Phoenix seeks a declaratory judgment that the Policy is null and void *ab initio* due to the lack of an insurable interest and as an illegal wagering contract.  The Policy was purchased with the intent to benefit a third party investor, which lacked the requisite insurable interest in Mr. Close's life at the time of the Policy's issuance.  The Policy's issuance violates the letter and spirit of Minnesota's insurable interest laws and is inconsistent with the state's public policy of prohibiting wagering on the lives of others.  The application for and purported ownership of the Policy by the Close Trust was merely a sham transaction intended to circumvent applicable insurable interest laws and public

policy.  The Policy is, therefore, null and void *ab initio* and is of no force and effect from its inception.

41.     Phoenix hereby fully and unconditionally tenders the Policy's premiums to the Court's registry.

42.     Notwithstanding paragraph 41, Phoenix seeks an order that it may retain all premiums paid on the Policy.

WHEREFORE, Phoenix demands judgment against the Bank of Utah, as securities intermediary, as follows:

1.     An order declaring and adjudging the Policy of life insurance bearing Policy Number 97523816 to be null and void *ab initio*;

2.     an order that Phoenix deposit with the Clerk of the Court all premiums paid on the Policy along with the required interest, if any;

3.     an order that the Clerk of Court return to Phoenix all of the premiums deposited with the Court or, alternatively, an order that the Clerk of the Court pay to Phoenix from the premiums deposited an amount equal to: 1) the compensation paid by Phoenix to any brokers arising out of or relating to the sale of the Policy; and 2) any damages incurred by Phoenix as a result of the Policy's issuance and subsequent investigation, including attorneys' fees and expenses;

4.     reasonable and necessary attorneys' fees and other costs incurred in this action;

5.     pre-judgment and post-judgment interest at the maximum lawful rate;

6.     costs of court; and

7.      such other and further relief as the Court deems equitable and just to

Phoenix.


                                        FRUTH, JAMISON & ELSASS, PLLC



Dated:  May 24, 2012                    By  s/ Adam A. Gillette
                                            Douglas L. Elsass (#219241)
                                            Adam A. Gillette (#0328352)
                                        3902 IDS Center
                                        80 South Eighth Street
                                        Minneapolis, MN 55402
                                        (612) 344-9700

                                        *ATTORNEYS FOR DEFENDANT*
                                        *PHL VARIABLE INSURANCE COMPANY*

OF COUNSEL:

EDISON, MCDOWELL & HETHERINGTON LLP

Thomas F.A. Hetherington*
Texas Bar No. 24007359
Jarrett E. Ganer*
Texas Bar No. 24055520
Phoenix Tower
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
tom.hetherington@emhllp.com
jarrett.ganer@emhllp.com
*\* Applications for admission pro hac vice to be filed.*