# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

PHL Variable Insurance
Company,

          Plaintiff and
          Counter Defendant,

      v.

Bank of Utah, as Securities
Intermediary,

          Defendant and
          Counterclaimant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-1256 ADM/JJK

---

Thomas F. A. Hetherington, Esq., Hutson B. Smelley, Esq., Jarrett E. Ganer, Esq., Shannon A. Lang, Esq., and Jason A. Richardson, Esq., Edison McDowell & Hetherington LLP, Houston, TX; and Adam A. Gillette, Esq., and Douglas L. Elsass, Esq., Fruth Jamison & Elsass PA, Minneapolis, MN, on behalf of Plaintiff.

Stephen G. Foresta, Esq., Philipp Smaylovsky, Esq., Nancy Harris, Esq., and Shaila R. Diwan, Esq., Orrick, Herrington & Sutcliffe LLP, New York, NY; and Kadee J. Anderson, Esq., and Timothy P. Griffin, Esq., Leonard Street and Deinard PA, Minneapolis, MN, on behalf of Defendant.

---

## I. INTRODUCTION

On September 19, 2013, the undersigned United States District Judge heard oral argument on Plaintiff  PHL Variable Insurance Company's ("PHL") Motion for Summary Judgment [Docket No. 133] and Motion to Exclude Expert Testimony [Docket No. 128], and Defendant Bank of Utah's Motion for Summary Judgment [Docket No. 145] and Motion to Exclude Expert Testimony [Docket No. 138].  For the reasons discussed below, PHL's Summary Judgment Motion is granted in part and denied in part, Bank of Utah's Summary Judgment Motion is denied, and the Motions to Exclude Expert Testimony are denied.

## II. BACKGROUND

This lawsuit arises out of a $5 million life insurance policy (the "Policy") issued by PHL on the life of William Close ("Close"), who is now deceased. PHL alleges the Policy is a stranger originated life insurance ("STOLI") policy that was initiated for the purpose of re-sale to investors on the secondary life insurance market. Compl. [Docket No. 1] ¶ 14. PHL seeks a judgment declaring the Policy void ab initio, arguing the policy lacked an insurable interest at the time it was issued, and is therefore an illegal wagering contract on Close's life. PHL also seeks a declaration that it may retain the premiums that were paid on the Policy. Bank of Utah denies that the Policy lacked an insurable interest when it was issued, and has filed a Counterclaim against PHL for breach of contract based on PHL's refusal to pay the Policy death benefit. Bank of Utah also asserts a Counterclaim for unjust enrichment, alleging PHL will be unjustly enriched if it wrongfully refuses to pay the death benefit while retaining the $520,000 in Policy premiums paid while the Policy was in force.

### A. Secondary Life Insurance Market and STOLI Policies

During the past two decades, the secondary market for life insurance, also known as the life settlements market, has experienced significant growth. Susan Lorde Martin, Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization, 134 U. Pa. J. Bus. L. 173, 184-87 (2010); Anthony Alt, Spin-Life Insurance Policies: A Dizzying Effect on Human Dignity and the Death of Life Insurance, 7 Ave Maria L. Rev. 605, 619-20 (2009). In this market, insureds named in life insurance policies they no longer need or can no longer afford sell their policies to investors, rather than discontinuing the premium payments and allowing the policies to lapse. Martin, supra, at 186-87. The insureds receive cash for their policies, and the investors, who

continue making the premium payments on the policies, are entitled to the policy death benefits when the insureds die. Id. at 186. Over the past decade, the life settlements industry began offering new investment opportunities by securitizing life insurance death benefits. Id. at 191-96. The securitization process involves packaging many policies together into bonds, which are then sold to investors. Id. at 192-94.

A shortage in the number of life insurance policies available for sale in the life settlements market led to an increase in STOLI policies. Robert S. Bloink, Catalysts for Clarification: Modern Twists on the Insurable Interest Requirement for Life Insurance, 17 Conn. Ins. L. J. 55, 78-79. In a typical STOLI transaction, an elderly individual obtains a high value life insurance policy for the benefit of a third party investor lacking an insurable interest in the life of the insured. PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust, 645 F.3d 965, 967 (8th Cir. 2011).[1] The insured is induced to participate in the transaction with the promise of "free" insurance during the contestability period or a profit from the future sale of the policy. Bloink, supra, at 79-80. The policy premiums are commonly financed with a non-recourse loan (meaning the lender may only seek recourse against the policy and not the insured's other assets to satisfy the debt) or a partial-recourse loan in which the loan is secured by the policy and by the insured's personal guarantee of a portion of the loan amount. Id. at 80-81. The financing becomes due following the lapse of the two-year period during which the insurer may contest the policy. J. Alan Jensen & Stephan R. Leimberg, Stranger-Owned Life Insurance: A Point/Counterpoint Discussion, 33 ACTEC J. 110, 111 (2007). If the insured dies

---

[1] An insurable interest is an economic or familial interest in having the insured's life continue, rather than end. Warnock v. Davis, 104 U.S. 775, 779 (1881).

during the contestability period, the financing is repaid with the proceeds from the death benefit. Id. If the insured survives the contestability period, the insured may repay the financing and keep the policy, sell the policy on the secondary market and repay the financing with the sale proceeds, or surrender the policy to the lender. Id. As discussed below in greater detail, a STOLI policy is void ab initio if it was procured under a scheme to assign it to one who benefits from the insured's early death rather than the insured's continued life.

**B. Close's Application for Life Insurance**

In May 2006, Harold Pomper ("Pomper"), a referring broker for Lextor Insurance LLC ("Lextor"), approached Close, a 74-year old retiree, about purchasing a life insurance policy. Pl.'s Ex. 1 at 9; Pl.'s Ex. 2 at 16, 19-21; Def.'s Ex. 1 at 25, 108-09.[2] Pomper lived in the same golf community as Close, and retained a list of people who were potentially qualified for the life insurance program being offered through Lextor. Pl.'s Ex. 1 at 16. Close and his wife Kathleen had not discussed needing a life insurance policy prior to being approached by Pomper, and had not carried life insurance since Close retired in 1999. Pl.'s Ex. 1 at 9, 17-18, 38.

Pomper told Close that the premiums for the life insurance policy would be paid through a loan funded by a hedge fund or other outside company, and that Close's beneficiary would collect a death benefit if he died during the policy's two-year contestability period. Def.'s Ex. 1 at 27-28, 85. Close told Pomper the arrangement sounded "very positive," and Pomper prepared

---

[2] Plaintiff's exhibits are located in a single declaration by Hutson B. Smelley. See Smelley Decl., Aug. 1, 2103 [Docket No. 135] (Pl.'s Exs. 1-26).

Defendant's exhibits are located in two declarations by Shaila R. Diwan and a third declaration by Philipp Smaylovsky. See Diwan Decl., Aug. 1, 2013 [Docket No. 148] (Def.'s Exs. 1-51); Diwan Decl., Aug. 22, 2013 [Docket No. 158] (Def.'s Exs. 52-67); Smaylovsky Decl., Sept. 5, 2013 [Docket No. 165] (Def.'s Exs. 68-77).

a preliminary application for him.  Id. at 28-29, 53, 85.

On August 11, 2007, Pomper, along with Brad Friedman ("Friedman"), a representative of Lextor Financial, met with the Closes in their home to discuss the life insurance policy.  Pl.'s Ex. 1 at 15-16.  Pomper and Friedman recall completing an application for life insurance through PHL at the meeting, however Kathleen Close does not recall any paperwork being filled out at that time.  Def.'s Ex. 1 at 55-56, 84-85, 109-10; Def.'s Ex. 2 at 32; Pl.'s Ex. 1 at 24.  The completed Application listed Close as the proposed insured, and the William Close 2007 Irrevocable Trust (the "Trust") as the proposed Policy owner.  Pl.'s Ex. 5 ("Application") at PHL/CLOSE 000986.  Friedman avers he and Close went through the questions on the Application, and that Friedman hand wrote the answers provided by Close.  Def.'s Ex. 2 at 45, 49, 52.  Friedman did not request documentation to verify the answers Close had given.  Id. at 48.  Friedman and Pomper both aver they had no reason to doubt the accuracy of Close's representations.  Id. at 99-100; Def.'s Ex. 1 at 87.

The completed Application stated Close had a net worth of $6,675,000 and income of $350,000.  Application at PHL/CLOSE 000986.  It further represented Close had never applied for life insurance and been declined, and had never been convicted of a felony.  Id. at PHL/CLOSE 000989.  There is no dispute the completed Application included gross misrepresentations.  The Closes' actual net worth in 2007, including their home, was less than one-tenth of the amount represented in the Application.  Pl.'s Ex. 1 at 50.  Their tax returns for 2006 and 2007 show adjusted gross income of less than $20,000 for each of those years.  Pl.'s Ex. 6.  Close had been convicted of a felony in 2002 for receiving illicit kickbacks while serving as a trustee for labor union pension funds.  Pl.'s Ex. 1 at 38; Def.'s Ex. 71.  Close had also

applied for life insurance with another carrier and been declined.  Def.'s Ex. 55, Def.'s Mem. Opp'n Summ. J. [Docket No. 157] at 23.  Friedman's signature appears on the earlier, rejected application as a witness to the application.  Def.'s Ex. 55.

The Application for the PHL Policy included a form titled, "Statement of Client Intent," in which PHL asked whether the proposed insured or owner would be borrowing the Policy premiums and, if so, the name of the premium financing program.  Application at PHL/CLOSE 000994.  The answer was checked "Yes," and "CFC of Deleware [sic]" was written in the space provided.  Id.  The form also asked whether the Policy was "being purchased in connection with any formal or informal program under which the proposed owner or proposed insured may have been advised of the opportunity to transfer the policy to a third party within five years of its issuance."  Id.  The answer to this question was checked "No."  Id.  The form further asked if the proposed insured or proposed owner had "any understanding or agreement providing for a party, other than the owner, to obtain any legal or equitable right, title or interest in the policy or entity owning the policy," and the answer was checked "No."  Id.  The form was signed by Close, Friedman, and the trustee of the Trust.  Id. at PHL/CLOSE 000995.

The answers on the Statement of Client Intent form are at odds with Kathleen Close's recollection of what the Closes were told at the meeting in their home.  Kathleen Close has testified in a deposition that she was told "right up front that [the Policy] was going to be sold," and that the Closes "knew that there was always going to be a third party."  Pl.'s Ex. 1 at 21, 30. She recalls Pomper and Friedman stating that they would look for an investor to purchase the Policy within two years, and that the Closes would receive $500,000 after the Policy had been sold.  Id. at 105-06.  When asked at her deposition whether there was any discussion in the

meeting as to who would pay the premiums on the Policy, Kathleen Close responded: "Well, it definitely wasn't us; that I know. I don't know who it was in the party, but I knew it was definitely not us, because we had no, we didn't have that kind of income to support the policy." Id. at 21. She further stated that Friedman told the Closes the Policy premiums would cost them no money. Id. at 26-27.

Friedman and Pomper both testified in depositions that they informed Close he could sell the Policy as an asset after two years and that it would be worth a percentage of the death benefit, but that they did not promise Close he would be paid $500,000. Def.'s Ex. 1 at 82-83; Def.'s Ex. 2 at 123; Def.'s Ex. 57 at 213. Friedman also testified that he informed Close of the option to repay the loan and keep the Policy, and stated that it was not his understanding that Close obtained the Policy to sell it. Def.'s Ex. 2 at 122; Def.'s Ex. 57 at 213-14.

## C. Policy Issuance

Upon receipt of the life insurance Application, PHL obtained an inspection report from a third party vendor ("Inspection Report") to verify Close's financial and medical representations. Def.'s Ex. 13 at 18; Def.'s Ex. 14. The Inspection Report was in the form of a questionnaire that had been completed by the vendor's inspector, using answers given by Close during a telephone interview. Def.'s Ex. 13 at 20, Def.'s Ex. 14.

The section of the questionnaire pertaining to Close's income and financial information was incomplete and facially inconsistent. Nearly all of the spaces providing for a breakdown of Close's income and net worth by category and amount were left blank. The questionnaire indicated Close had annual income of $375,000 derived entirely from dividends, and a net worth of $6,700,000. Def.'s Ex. 14 at PHL/CLOSE000471. The inspector included the following

comment: "Applicant gave the sum of his net worth to include his home, rental properties, savings, investments and personal effects.  Did not provide a further breakdown.  We learned of no financial problems."  Id.  Although the Inspection Report stated Close owned rental properties, no rental income was reported in the space provided on the questionnaire.

The Inspection Report indicates the information provided by Close had been confirmed with an unnamed personal reference who had known Close for five years.  Def.'s Ex. 13 at 21, Def.'s Ex. 14 at PHL/CLOSE000471.  When the PHL underwriter who underwrote the Policy was asked about the Inspection Report in a deposition, the underwriter stated he would have wanted to obtain further verification of the information based on what was provided in the Inspection Report.  Def.'s Ex. 12 at 195.

In addition to the suspicious Inspection Report, the Application for the Policy showed the initial annual premium of $272,025 amounted to 77% of Close's stated income of $350,000.  Id. at 172-73; Application at PHL/CLOSE000986, PHL/CLOSE001000.  The Policy underwriter and PHL's Chief Underwriter both testified in depositions that the 77% ratio was unusually high and was something an underwriter would question.  Def.'s Ex. 12 at 173-74; Def.'s Ex. 13 at 52-53.  The underwriting file for the Policy lacks evidence showing PHL sought or obtained additional information about Close's finances before issuing the Policy on September 11, 2007. Def.'s Ex. 16.

**D.  Trust Agreement**

The Policy was owned by the Trust, which had been established for the purposes of owning the Policy and performing the obligations under a financing agreement with CFC of Delaware, LLC ("CFC").  Pl.'s Ex. 7 ("Trust Agreement") ¶ 4.A.  Friedman testified the Trust

was "put together by CFC" because CFC, as the entity that would be financing the Policy, "obviously had to be involved and a participant in the trust . . . ." Def.'s Ex. 2 at 34-35, 46.

The Trust Agreement designated Kathleen Close as the Trust's beneficiary, and BNC National Bank ("BNC") as Trustee. Trust Agreement ¶¶ 4.B., 5.A. While serving as trustee of the Trust, BNC also served as CFC's administrative agent. Pl.'s Ex. 8 at BOU0000954.

The Trust Agreement also designated Ryan K. Crayne ("Crayne") as Trust Protector. Trust Agreement ¶ 6.A. The Trust Protector was authorized to make certain discretionary decisions for the Trust, including the decision to apply for, purchase, or dispose of a life insurance policy. Trust Agreement ¶ 6.C. Crayne was a self-described "default trust protector," meaning he served as Trust Protector in instances where an insured did not name their own local attorney or CPA as protector. Pl.'s Ex. 16 at 61. Crayne served as the default Trust Protector for "at least a hundred trusts" associated with BNC. Id. Crayne described the Trust as a "special purpose vehicle for this premium finance transaction" with CFC. Def.'s Ex. 22 at 86.

### E. Loan from CFC

To finance the Policy's $300,225 in premium payments and incidental costs, Close applied for a loan from CFC. See Def.'s Ex. 10. CFC was in the business of making loans to irrevocable life insurance trusts under a premium finance program financed by New Stream Insurance, LLC ("New Stream"). Def.'s Ex. 24 at BOU0001298. CFC had served as the premium financer on several policies produced by Lextor, and Friedman introduced Close to CFC. Def.'s Ex. 2 at 35-36.

The CFC loan application consisted of two pages, and provided that Close would not pledge any of his assets as collateral for the loan, but would offer a personal guarantee. Def.'s

Ex. 10.  The only financial information requested on the loan application was whether the applicant's net worth exceeded $1,000,000 as of the date of the application, and whether the applicant had individual income exceeding $200,000 in each of the last two years or joint income with the applicant's spouse exceeding $300,000.  Id.  Close represented his net worth exceeded $1,000,000 as of the date of the application, but that his individual and joint income did not exceed $200,000 and $300,000, respectively, in the last two years.  Id.  The record includes no evidence of attempts by CFC to verify Close's financial information.

CFC approved the loan and entered into a Term Financing Facility Agreement with the Trust on September 18, 2007.  Pl.'s Ex. 8.  Under the financing arrangement, CFC agreed to loan the Trust a principal amount of $300,225, which included $272,025 in premiums, $16,000 in closing fees, an $11,200 origination fee, and $1,000 to terminate the Trust.  Pl.'s Ex. 9 at BOU0001011.  The term of the loan was two years, subject to a ninety-day extension upon the written request of the Trust and the consent of CFC.  Pl.'s Ex. 8 at BOU0000931-32, BOU0000956.

As part of the financing arrangement, the Trust granted CFC a security interest in the Policy.  Id. at BOU0000933.  BNC, as trustee, executed a collateral assignment of the Policy to CFC and submitted it to PHL, which recorded the assignment on or about October 1, 2007.  Def.'s Ex. 17.  Close also agreed to personally guarantee repayment of 25% of the loan amount in the event the Trust defaulted on the loan.  Def.'s Ex. 18.  No other collateral was pledged to secure the loan.  There is no evidence that CFC performed any underwriting beyond the loan application to determine whether the Trust could repay the loan.

**F. Funding by New Stream**

The funds for the Policy were provided entirely by New Stream.  See Pl.'s Exs. 11, 12.

New Stream was a hedge fund that invested in life insurance products, specifically life

settlements and premium finance loans.  In re New Stream Capital, Inc., Case No. 11-

10753(MFW) (Bankr. D. Del. 2011) ("New Stream Bankruptcy Case") [New Stream Bankruptcy

Case Docket No. 4] (Disclosure Statement) at 59.[3]  New Stream had provided funding to CFC's

premium finance program since 2006 by making loans to irrevocable life insurance trusts

pursuant to documents approved by New Stream.  Def.'s Ex. 24 at BOU0001298.  On September

28, 2007, New Stream's Credit Committee authorized the advance of $300,225 from New

Stream to the Trust.  Pl.'s Ex. 11.  The advance by New Stream was collateralized by the Policy,

which New Stream appraised at $1,374,200.  Id.  The Closes never paid any of the Policy

premiums.  Pl.'s Ex. 1 at 49.

**G. Policy Surrender**

In July 2009, CFC sent a letter to the Closes (as the Trust's grantor and beneficiary,

respectively) and to Crayne (as the Trust Protector) informing them that the loan to the Trust

would mature in December 2009.  Def.'s Ex. 20.  The letter stated the Trust's options to repay

the loan included refinancing the loan with CFC, refinancing the loan with third party, repaying

the loan with available personal funds, or selling the Policy and using the sale proceeds to repay

the outstanding loan amount.  Id.

---

[3] As of July 31, 2010, New Stream directly owned hundreds of life insurance policies, including nearly 150 that had been originated by CFC.  See id. at [New Stream Bankruptcy Case Docket No. 58, Attach. 2] (Asset Purchase Agreement) at Schedule 1 (Schedule of Assets and Purchase Prices).

Close spoke with Friedman about selling the Policy to repay the loan. Def.'s Ex. 2 at 174. In connection with the attempted sale, Close faxed Friedman his medical records on October 8, 2009. Pl.'s Ex. 1 at 23; Pl.'s Ex. 21. Close's medical records showed he had a mass in his left lung and possible metastatic lesions in both lungs. Pl.'s Ex. 21 at PHL/CLOSE004151. The records stated Close was "presently under the care of [an] oncologist," and included a notation about Close's "possible cancer." Id. at PHL/CLOSE004179-80. Friedman avers he attempted to sell the Policy, either personally or through a broker, but does not recall who he attempted to sell it to. Def.'s Ex. 2 at 174-78. Friedman further testified that the "policy wasn't worth a lot of money at the time" because Close "was relatively healthy, I think." Id. at 178-79.

The Policy was not sold, and the Closes could not afford to pay the premiums when the loan matured. Pl.'s Ex. 1 at 23, 47-48. On January 7, 2010, Crayne, as trust protector, delivered an instruction letter to BNC, as administrative trustee, directing BNC to deliver forms to PHL to change the owner and beneficiary of the Policy to New Stream. Pl.'s Ex. 19. Crayne directed that the instruction letter be held by BNC until BNC received signed documents from the insured (Close) and the primary beneficiary (Kathleen Close). Id. Crayne issued the instruction letter without speaking with Close about Close's intent concerning the Policy, and without knowledge that Close had been diagnosed with cancer. Pl.'s Ex. 16 at 77, 87-89. When asked if surrender of the Policy was the best option available to Close, Crayne testified he would have expected Close to "scramble to find refinancing" and keep the Policy if he had been ill. Id. at 87.

Approximately one week after Crayne issued the instruction letter to change the Policy's owner and beneficiary to New Stream, Close and BNC executed documents surrendering the

Policy to CFC in full satisfaction of all the Trust's obligations to CFC.  Def.'s Ex. 23 at

BOU0000171-76.  In turn, CFC designated New Stream as the assignee of the Policy in full

satisfaction of all CFC's obligations to New Stream relating to the Policy.  Id. at BOU0000171.

Kathleen Close, as beneficiary of the Trust, executed a document acknowledging the Trust's

surrender of the Policy to New Stream.  Id. at BOU0000184-85.  New Stream submitted change

of ownership and change of beneficiary forms to PHL, which recorded the changes.  Def.'s Ex.

26.  The Closes never received any payment in exchange for the Policy.  Pl.'s Ex. 1 at 80.

**H.  Transfer to Bank of Utah as Securities Intermediary**

New Stream subsequently transferred the Policy to Bank of Utah, which held the Policy

as a securities intermediary.  Def.'s Ex. 27.  PHL was informed of and recorded the Policy

transfer.  Def.'s Ex. 28.  On June 2, 2011, New Stream sold its interest in the Policy to Limited

Life Assets Services Limited ("LLAS") in connection with the liquidation of New Stream's

assets in bankruptcy.  See generally Def.'s Ex. 30.  Bank of Utah then became the securities

intermediary for LLAS.[4]

**I.  Dispute Over Death Benefit**

William Close died of lung cancer on November 18, 2011.  Def.'s Ex. 32 at PHL/CLOSE

000016. Bank of Utah submitted a claim for the $5 million death benefit in January 2012.  Def.'s

Exs. 38-39.

On May 24, 2012, PHL filed this action seeking a declaration that the Policy is void for

---

[4] As a securities intermediary, Bank of Utah is the Policy's legal owner and custodian of
the Policy.  Although Bank of Utah is the technical owner, it holds the Policy in a securities
account for LLAS, which owns the entire beneficial interest, including the Policy proceeds.
Feotis Decl., Apr. 1, 2013 [Docket No. 101] at ¶¶ 2-3.

lack of an insurable interest and that PHL may retain the Policy premiums.  See generally Compl.  Bank of Utah filed a counterclaim for breach of contract and unjust enrichment based on PHL's alleged wrongful refusal to pay Bank of Utah's claim on the Policy while retaining over $520,000 in premiums to keep the Policy in force.  Answer and Countercl. [Docket No. 8] at 12, 22.[5]

PHL now moves for summary judgment as to all claims, and Bank of Utah moves for summary judgment as to its breach of contract Counterclaim.[6]  PHL argues the Policy lacked an insurable interest from inception because the Policy was not obtained in good faith, served no legitimate insurance need, and was merely a cover for a gambling contract on Close's life.  PHL therefore argues the Policy is void ab initio and must be treated as though it never existed.  PHL also contends that because the Policy is void, the Court should leave the parties as it found them and allow PHL to retain the premiums.

Bank of Utah argues the Policy had an insurable interest from inception.  Bank of Utah reasons the Policy was obtained by Close and named his wife as beneficiary, and each had an insurable interest in Close's life.  Bank of Utah further contends the Policy was a valid contract and not a cover for a wager, because there is no evidence of a preconceived agreement when the Policy was issued to transfer it to a third party lacking an insurable interest.  Bank of Utah also argues PHL is estopped from arguing the Trust and loan arrangements were designed to cloak a

---

[5] Bank of Utah also asserted counterclaims for alleged violations of Connecticut's Unfair Trade Practices Act and Unfair Insurance Practices Act which were dismissed in October 2012.  See Mem. Op. and Order, Oct. 10, 2012 [Docket No. 29].

[6] Bank of Utah has not moved for summary judgment on its Counterclaim for unjust enrichment.  See Def.'s Mot. Summ. J. [Docket No. 145] at 1; Def.'s Mem. Supp. Summ. J. [Docket No. 147] at 27.

wagering contract, because PHL was aware of and did not object to the Trust's ownership of the Policy and to the Trust's financing of the Policy through CFC's premium financing program. Bank of Utah further contends that if the Policy is declared void, PHL will be unjustly enriched if it is allowed to retain the Policy premiums.

## III. DISCUSSION

### A. Summary Judgment Motions

#### 1. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

#### 2. Analysis

##### a. Insurable Interest Challenge

The central issue is whether an insurable interest existed in the Policy at the time it was issued. An insurable interest is an interest in the continued life of the insured, based on a familial or economic relationship. See, e.g., Hogue v. Minn. Packing & Provision Co., 60 N.W.

812, 813 (Minn. 1894); <u>Rahders, Merritt & Hagler v. People's Bank of Minneapolis</u>, 130 N.W.

16, 17 (Minn. 1911). Under Minnesota common law,[7] a life insurance policy "issued to one who

has no interest in the continuation of the life of the person insured, is both a gambling contract,

and a contract which creates a motive for desiring the termination of such life, and is therefore

against public policy and void." <u>Christenson v. Madson</u>, 149 N.W. 288, 289 (Minn. 1914);

<u>accord</u> <u>Grigsby v. Russell</u>, 222 U.S. 149, 154 (1911) ("A contract of insurance upon a life in

which the insured has no interest is a pure wager that gives the insured a sinister counter interest

in having the life come to an end."); <u>Bankers' Reserve Life Co. v. Matthews</u>, 39 F.2d 528, 529

(8th Cir. 1930) ("An insurance contract originally made for the benefit of one not having an

'insurable interest' in the life of the insured is void as against public policy.").

Generally, once a life insurance policy has been validly procured, it may be assigned to a

third party that does not have an insurable interest. <u>Sun Life Assurance Co. of Canada v.

Paulson</u>, Civ. No. 07-3877 DSD/JJG, 2008 WL 451054, at *1 (D. Minn. Feb. 15, 2008)

("<u>Paulson</u> I") (citing <u>Peel v. Reibel</u>, 286 N.W. 345, 346 (Minn. 1939)). The rule allowing for

such assignment is based on the recognition that a life insurance policy is a form of property, and

that the value of property is maximized if the owner has the right to freely assign it. <u>Rahders</u>,

130 N.W. at 17.

---

[7] In 2009, the Minnesota legislature passed the Minnesota Insurable Interest Act, Minn. Stat. §§ 60A.078, <u>et seq.</u>, which defines STOLI and addresses practices commonly involved in the increasingly sophisticated schemes by third party investors to evade the insurable interest requirement. The Act is to be given prospective application, and thus does not apply to the Policy, which was issued in 2007. <u>See</u> 2009 Minn. Sess. Law Serv. Ch. 52 (S.F. No. 166), Sec. 11 ("This act is effective for policies issued on or after the day following final enactment," <u>i.e.</u>, May 10, 2009). Therefore, Minnesota common law governs PHL's challenge to the Policy's validity.

However, an exception to the rule permitting the assignment of life insurance policies exists when an assignment is not made in good faith, but is instead "a mere cover for taking out insurance in the beginning in favor of one without [an] insurable interest . . . ." Peel, 286 N.W. at 346 (internal alterations omitted); see also Rahders, 130 N.W. at 17 ("Of course, good faith in the [assignment] is required, and the courts do not hesitate to condemn a policy issued for the purpose of having it assigned.").[8]  If a life insurance policy was  "procured under a scheme, purpose, or agreement to transfer or assign the policy to a person without an insurable interest in order to evade the law against wagering contracts," it violates public policy and is void ab initio. Paulson I, 2008 WL 451054, at *2 (quoting 44 C.J.S. Insurance § 353 (2007)).

### i.  Contestability Period

As a threshold matter, Bank of Utah argues PHL's challenge to the Policy is time-barred because the two-year contestability period expired.  By statute, all insurance policies issued in Minnesota must include a provision stating the policy is "incontestable after it has been in force during the lifetime of the insured for two years from its date."  Minn. Stat. § 61A.03, Subd. 1(c). Consistent with this requirement, the Policy states that it is incontestable "after it has been in force during the Insured's lifetime for two years from the Issue Date."  Def.'s Ex. 16 at BOU0000864.  The Policy was issued on September 17, 2007; therefore, the contestability

---

[8] The United States Supreme Court and Eighth Circuit similarly recognize that a person may not procure a policy on his or her life and assign it to one without an insurable interest to cloak what is, at inception, a wagering contract.  Grigsby, 222 U.S. at 156 ("[C]ases in which a person having an interest lends himself to one without any, as a cloak to what is, in its inception, a wager, have no similarity to those where an honest contract is sold in good faith."); Matthews, 39 F.2d at 529 ("The crux is whether the policy was a wagering contract at the time it became effective as a contract.  If, at that time, such assignment was contemplated by the insured, it is a wagering contract, otherwise it is not.").

period expired on September 17, 2009.

PHL responds that the incontestability provision does not apply to policies that are void ab initio, because a void contract is treated as though it never existed. Thus, a provision within a void policy cannot be enforced.

Courts are divided on whether a policy may be challenged for lack of insurable interest beyond the contestability period. PHL Variable Ins. Co. v. U.S. Bank Nat'l Ass'n, Civ. No. 10-1197 RHK/AJB, 2010 WL 3926310, at *4 n.3 (D. Minn. Oct. 4, 2010); Pruco Life Ins. Co. v. U.S. Bank, No. 12-24441-CIV, 2013 WL 4496506, at *4 (S.D. Fla. Aug. 20, 2013). Most of the state courts that have considered the issue have held that an insurer can challenge the policy, because a policy issued to one lacking an insurable interest is void from inception, and so the policy and its provisions—including the incontestability provision—never came into force and have no effect. Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust, 28 A.3d 436, 440 (Del. 2011) (citing cases).

The Minnesota Supreme Court has not yet addressed this issue. The Paulson decision from this federal district can be interpreted as following the majority view. See Paulson I, 2008 WL 451054, at *2 (holding incontestability provision applied because insurer failed to allege facts contesting policy was void ab initio). Reflective of the majority view of the case law, Minnesota's statute governing the incontestability period states a policy is incontestible after it has been "in force . . . for two years," thereby making the incontestability period contingent on the existence of a valid contract. Minn. Stat. § 61A.03, Subd. 1(c) (emphasis added). A policy that is void ab initio never comes into force, and so the incontestability provision of such policy has no effect. See PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust, 28 A.3d 1059, 1066-67

(Del. 2011).  Accordingly, PHL's insurable interest challenge is not time-barred by the Policy's incontestability clause.

### ii.  Waiver and Estoppel

An additional threshold issue is whether the equitable principles of waiver and estoppel prevent PHL from challenging the Policy's validity.  Bank of Utah argues PHL should be precluded from now asserting that the Policy is void, because PHL knew of and approved the premium finance program used to initially fund the Policy, knew of and acknowledged each transfer of the Policy, repeatedly represented the Policy was in force, and continually solicited and collected premiums for the Policy.

The Minnesota Supreme Court has repeatedly held that contracts which are contrary to public policy are not enforceable in equity.  See, e.g., Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emp., Lodge 364 v. State by Balfour, 229 N.W.2d 3, 12 (Minn. 1975) ("Illegal agreements (or those void as against public policy) will not be validated by resort to an equitable remedy."); Seitz v. Michel, 181 N.W. 102, 104 (Minn. 1921) ("A contract, void because contrary to public policy, cannot be . . . validated.  Neither party is estopped from questioning it because the other has parted with property or rendered services in reliance upon it.").  Courts have consistently applied this legal principle to life insurance contracts to hold that waiver and estoppel cannot give legal effect to a policy lacking an insurable interest in the insured's life.  See, e.g., Beard v. Am. Agency Life Ins. Co., 550 A.2d 677, 688 (Md. 1988) (holding life insurance contracts lacking an insurable interest were "against public policy and void ab initio; thus the doctrines of waiver and estoppel do not apply and are not a bar to the insurable interest defense"); Rubenstein v. Mutual Life Ins. Co. of New York, 584 F. Supp. 272,

279 (E.D. La. 1984) ("[T]he insurance company cannot waive or be estopped from asserting lack of insurable interest by its conduct in issuing the policy.").

Bank of Utah cites Riteway Carriers, Inc. v. Stuyvesant Ins. Co., 114 F. Supp. 507, 510 (D. Minn. 1953) to support their argument that the lack-of-insurable-interest defense is waivable in Minnesota. However, Riteway involved an automobile collision insurance policy, and thus the public policy concerns raised by allowing strangers to initiate gambling contracts on the lives of others was not at issue. See Riteway, 114 F. Supp. at 509. Bank of Utah also relies on Katun Corp. v. Clarke, 484 F.3d 972, 975-76 (8th Cir. 2007), to argue estoppel may be applied to preclude a challenge to a contract based on illegality. The circumstances here are distinguishable from Katun, a non-insurance case involving an agreement that was determined not to be "an illegal demand or patently in violation of public policy." Id. at 978. In contrast to the contract in Katun, a life insurance policy lacking an insurable interest at inception clearly violates public policy.

Therefore, principles of waiver and estoppel do not bar PHL from challenging the Policy's validity on insurable interest grounds, regardless of PHL's alleged knowledge and conduct.

### iii. Scheme, Purpose, or Agreement to Transfer

As stated earlier, a life insurance policy is contrary to public policy and void ab initio "if the policy was procured under a scheme, purpose, or agreement to transfer or assign the policy to a person without an insurable interest in order to evade the law against wagering contracts." Paulson I, 2008 WL 451054, at *2 (quotation omitted).

In determining the existence of a such a scheme, purpose, or agreement, courts look to

the "mutual intent of the insured and the third party" at the time the policy was procured.  Id.  If, at that time, the insured and a third party mutually intended to avoid the prohibition on wagering contracts, the policy lacks an insurable interest and is void ab initio.  Id.  PHL argues the "essential element" of the insurable interest requirement is "whether the policy was procured in good faith for a legitimate insurance need."  Pl.'s Mem. Opp'n Summ. J. [Docket No. 151] at 2. Under the standard urged by PHL, an insured would not need to show that a third party lacking an insurable interest also intended, at the time the policy was procured, to acquire the policy. However, nearly every court to have considered the issue has held, similar to Paulson I, that an insured's intent, standing alone, does not destroy an insurable interest.  See, e.g., First Penn-Pacific Life Ins. Co. v. Evans, 313 F. App'x 633, 636 (4th Cir. 2009) (holding insurable interest existed where no third party participated in procurement of policy); Sun Life Assurance Co. of Canada v. Berck, 770 F. Supp. 2d 728, 734-35 (D. Del. 2011) (requiring bilateral intent of insured and third party to show violation of insurable interest law); Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust, 869 F. Supp. 2d 556, 565 (D. Del. 2012) (stating intent of policyholder alone to transfer policy not sufficient to constitute a wager); Dawe, 28 A.3d at 1076 ("[T]he insured's subjective intent for procuring a life insurance policy is not the relevant inquiry.  The relevant inquiry is who procured the policy and whether or not that person meets the insurable interest requirements.").  The obvious rationale for requiring an insurer to show a third party intentionally engaged in a scheme to disguise a wagering policy is that a wagering policy requires a wagerer.  See Evans, 313 F. App'x 633, 636 ("No third party participated in the procurement of [the] policy and therefore no one was 'wagering' on [the insured's] life in violation of public policy.").

Factors considered in determining whether an insured and third party mutually intended to evade the law against wagering contracts include: an insured's inability to afford premiums and lack of realistic options to retain the policy; the absence of an insured's personal desire to obtain life insurance; whether the insured was offered incentives such as "quick cash" or "free" insurance; and the length of time the insured held the policy before transferring it. Life Prod. Clearing, LLC v. Angel, 530 F. Supp. 2d 646, 654-55 (S.D.N.Y. 2008). An additional and significant factor is whether the third party investor who acquired the policy was the party funding the premiums. See Sun Life Assurance Co. of Canada v. Paulson, Civ. No. 07-3877 DSD/JJG, 2008 WL 5120953, at *4 (D. Minn. Dec. 3, 2008) ("Paulson II") (indicating payment of policy premiums is evidence of third party intent to acquire policy); Rucker, 869 F. Supp. 2d at 565 (stating third party investor's payment of premiums or loaning money to insured to cover premiums "would be clear evidence of an agreement for [an insured] to later sell the Policy to [the investor].");[9] Dawe, 28 A.3d at 1076 ("If the third party funds the premium payments by providing the insured the financial means to purchase the policy then the insured does not procure or [e]ffect the policy."). Applying the factors here, the only reasonable conclusion to be drawn from the evidence of record is that Close, CFC, and New Stream mutually intended from the time of the Policy's inception that the Policy would be transferred to a third party lacking an insurable interest.

---

[9] An insured is not foreclosed from borrowing money to pay for premiums, and "borrowing money with an obligation to repay would . . . qualify as an insured procuring a policy." Rucker, 869 F. Supp. 2d at 563. However, when a third party investor is the source of the borrowed funds and then later acquires the policy, the circumstances serve as strong evidence that an insurable interest is lacking. See id. at 563-64.

### iii(a).  Close's Intent

With respect to Close's intent, the unrebutted evidence shows Close: (1) was informed by Pomper that Close's designated beneficiary on the Policy would be entitled to the benefit only for the first two years; (2) could not afford the Policy and never made a premium payment; (3) pledged no assets other than the Policy as collateral for the premium finance loan; (4) knew the Policy would be funded by a hedge fund or other third party investor; and (5) surrendered the Policy even though he was terminally ill.  Additionally, Kathleen Close's testimony is that she was "told right up front that [the policy] was going to be sold," that they would pay nothing during the two years Close held the insurance, and that they would receive $500,000.  Pl.'s Ex. 1 at 21, 26-27.  She further testified that the Closes "knew that there was always going to be a third party."  Id. at 25.[10]  The only reasonable conclusion to be drawn from the entirety of these circumstances is that at the time the Policy was procured, Close intended to transfer it to a third party lacking an insurable interest on his life.

### iii(b).  CFC and New Stream's Intent

Additionally, it cannot be genuinely disputed that CFC and New Stream intended to participate in a preconceived scheme or arrangement to acquire the Policy upon expiration of the contestability period.  The Policy was desirable as a wagering contract because of its high face value and because the insured was in his mid-seventies.  There is no evidence CFC performed

---

[10] Bank of Utah challenges Kathleen Close's testimony, arguing she is a biased witness because she has stated that if the $5 million death benefit is to be paid by PHL, she wants to "get something out of it" if  Def.'s Mem. Opp'n Summ. J. [Docket No. 157] at 10 n.4 (quoting Def.'s Ex. 46 at 1256 GlobalSource 00077).  Under this theory, however, Kathleen Close would be motivated to craft her testimony in a way that supports, rather than undermines, the Policy's validity so that the death benefit will be paid.

any underwriting before providing Close with the $300,225 loan and securing the Policy as collateral. The absence of underwriting suggests CFC intended to be repaid through acquisition of the Policy, rather than through payments on the loan. New Stream assisted in procuring the Policy by providing the funds for the Policy premiums and related expenses, including an up-front $1,000 charge for terminating the Trust after two years. See Dawe, 28 A.3d at 1076 (stating party that funds premiums is party that procures policy). The termination fee reflects the parties' intent that the Policy would be transferred after the contestability period expired.

Additionally, New Stream's ownership of approximately 145 policies that were acquired through CFC's premium lending program is further evidence that New Stream loaned funds to CFC for the intended purpose of acquiring the policies when those loans defaulted. See Ex. 30 at 47-50.[11]

Further evidence of a preconceived scheme by CFC and New Stream to acquire the Policy is found in the complex arrangements among Close, the Trust, CFC, and New Stream, which served as a ruse for what essentially was a wager policy. "[A]n assignment may not be used as a formalistic cover for what in substance amounts to a wager. . . . [I]gnoring intent would result in an illogical triumph of form over substance that would completely undermine the public policy goals behind the insurable interest requirement." Dawe, 28 A.3d at 1071; see also Angel, 530 F. Supp. 2d at 656 (rejecting investor's argument that series of contractual steps were separate legal transactions rather than a single sham transaction, and stating "[t]he law prohibits gaming the system to procure wager policies, regardless of the creativity of form"). The

---

[11] For ease of reference, the cited page numbers for this Exhibit are to those numbered in the CM/ECF system.

evidence shows the transactions involved in the Policy's issuance were formalities designed to

disguise a wager.  For example, there is no evidence CFC performed any underwriting before

loaning over three hundred thousand dollars to Close, who lacked the financial resources to

repay the loan.  Additionally, the loan was provided at no risk to Close, as the Policy served as

the only collateral securing the loan and the personal guarantee was in form only and never

actually enforced.  The protector of the Trust (a trust established at the behest of CFC)

authorized the Trust's surrender of the Policy to CFC without speaking with Close to determine

whether surrender was in the Trust's best interests.  After the Policy was surrendered, it was

added to New Stream's substantial portfolio of life insurance policies.  When viewed in totality,

the transactions demonstrate that the loan and Trust arrangements among Close, CFC, and New

Stream were, in practice, hollow formalities designed to circumvent the insurable interest

requirement.  The transactions' form will not be allowed to prevail over their substance.[12]

 Bank of Utah offers several arguments to demonstrate that CFC and New Stream did not

intend, at the time of issuance, to acquire the Policy.  However, each argument lacks merit.

Bank of Utah first argues that the record fails to establish CFC and New Stream's intent to

procure the Policy because there is no evidence CFC and New Stream knew the representations

of Close's income and net worth were false and that Close would be unable to repay the loan.

---

[12] In an insurable interest case applying California law, a federal judge declined to look behind the terms and formalities of a contract assigning a life insurance policy to a lender, even though the lender's finance program "skirt[ed] close to the letter, and certainly [could] be viewed as violating the spirit, of the law."  Lincoln Nat'l Life Ins. Co. v. Gordon R.A. Fishman Irrevocable Life Trust, 638 F. Supp. 2d 1170, 1179 (C.D. Ca. 2009).  However the facts in that case are materially distinguishable from those here.  The insured in Fishman had a verified net worth of $90 million, and as well as an actual insurance need of $25 to $30 million to protect against estate taxes.  Id. at 1174-75.  In contrast, Close did not need and could never afford the Policy he acquired and later surrendered.

However, CFC and New Stream advanced hundreds of thousands of dollars to Close based on a loan application that asked only two yes-or-no questions about his finances. CFC and New Stream's lack of any meaningful underwriting allowed them to be willfully blind to Close's financial condition and should not operate to preclude a finding that CFC and New Stream intended to evade the insurable interest requirement.

Also unavailing is Bank of Utah's argument that an insurable interest existed during the first 28 months of the Policy because the Policy owner (the Trust), the Policy beneficiary (the Trust), and the Trust beneficiary (Kathleen Close) each had an insurable interest in Close's life. This arrangement merely evinces CFC and New Stream's efforts to further disguise what was from inception a wagering contract. New Stream's willingness to wait out the contestability period before formally acquiring the Policy does not alter that the Policy was intended from the day it was issued to be a gamble on Close's life.

Finally, Bank of Utah argues the transfer of the Policy to New Stream was entirely unintended, as Close always had the option to repay the loan and keep the Policy or to sell the loan to another investor. Bank of Utah contends Close only agreed to transfer the Policy after he was unable to sell it on the life settlements market, which had unpredictably and severely declined in early 2009. However, retaining the Policy was never a realistic option for Close, who lacked the financial resources to repay the loan from the day it was approved. Additionally, though Friedman claims he could not sell the Policy because Close was "fairly healthy," Friedman possessed documents showing Close had a mass and possible metastatic lesions in his lungs and was being treated by an oncologist. The record demonstrates CFC and New Stream willfully failed to investigate whether Close was capable of repaying the loan. Instead, they

enabled the 74-year-old Close to procure a multi-million dollar Policy he could not afford and never paid for, took over the Policy at the end of the contestability period when Close could not repay the premium loan, and added the Policy to New Stream's substantial life insurance portfolio. Through these actions and inactions, CFC and New Stream intentionally acquired a life insurance policy they could not have obtained on their own due to a lack of insurable interest in Close's life. The Court therefore finds the Policy was procured by a scheme to assign it to a party lacking an insurable interest and with the mutual intent of circumventing the law against wagering policies. Thus, the Policy is void as against public policy.

Accordingly, PHL's summary judgment motion is granted as to the request for a declaration that the Policy is void ab initio as against public policy. Bank of Utah's summary judgment motion is denied as to the breach of contract counterclaim, because a contract that is contrary to public policy is unenforceable under Minnesota law. See Grover v. Merritt Dev. Co., 47 F. Supp. 309, 317-18 (D. Minn. 1942) ("[C]ourts will not lend their aid to enforce illegal contracts or contracts inconsistent with sound morals or public policy."); Seitz, 181 N.W. at 105 ("A court will not directly enforce a contract or recognize it by awarding damages for its breach if it is contrary to public policy, but will leave the party where it finds them . . . .").

### b. Retention of Premiums, Unjust Enrichment

PHL also moves for summary judgment on its request for a declaration that it is entitled to retain the premiums paid on the Policy, and seeks summary judgment denying Bank of Utah's Counterclaim for unjust enrichment. PHL argues that where a contract is an illegal wagering contract, it is treated as though it never existed, and premiums cannot be recovered. Bank of Utah contends summary judgment must be denied, because PHL would be unjustly enriched if it

were allowed to retain premiums on a Policy on which it was never required to pay a contractual benefit.[13]

When a policy has been declared void ab initio, the general rule in Minnesota is that the premiums paid on the policy must be returned unless the policy is "against law or public morals" or procured by insured's fraud. Taylor v. Grand Lodge A.O.U.W. of Minn., 105 N.W. 408, 413 (Minn. 1905); In re Millers' & Mfrs.' Ins. Co., 106 N.W. 485, 494 (Minn. 1906) (stating premiums paid on an illegal insurance contract "cannot be recovered, unless the parties are not 'in pari delicto'" (internal citations omitted); see also Morello, 645 F.3d at 969-70 (holding insurer entitled to retain premiums on insurance policy procured by fraud); PHL Variable Ins. Co. v. 2008 Christa Joseph Irrevocable Trust, No. 10-CV-3001 PJS/TNL, 2013 WL 4829291, at *12 (D. Minn. Sept. 10, 2013) (same). Here, the Policy falls within the "against law or public morals" exception, as it was invalidated for being an illegal wagering contract that is against public policy.[14] Where a contract violates public policy, a court must act as though it never

---

[13] PHL contends Bank of Utah's Counterclaim requested only payment of the death benefit and not a recovery of premiums paid on the Policy. See Pl.'s Mem. Supp. Summ. J. [Docket No. 136] at 32, n.18. However, Bank of Utah has maintained throughout this litigation that PHL must return the premiums. See, e.g., Answer and Countercl. [Docket No. 8] at 10 ¶ 42 (Bank of Utah's Answer denying that PHL is entitled to retain premiums). Federal Rule of Civil Procedure 54(c) provides in relevant part that "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Therefore, the Court may award such relief even though Bank of Utah did not specifically request it in its Counterclaim. See Bowles v. Osmose Utils. Servs., Inc., 443 F.3d 671, 675 (8th Cir. 2006) (affirming award of punitive damages not requested in complaint, pursuant to Rule 54(c), where defendant had notice of plaintiff's intent to seek such damages and was aware of the type of claims involved in the litigation).

[14] The Policy was not invalidated due to fraud, as PHL's ability to challenge the Policy based on fraud was time-barred by the two-year incontestability statute. Therefore, the Policy does not come within the "procured by insured's fraud" exception to the general rule requiring the return of premiums.

existed and take no further action with respect to the contract. Seitz, 181 N.W. at 105 (stating court does not enforce or award damages for contract contrary to public policy, but instead "leave[s] the parties where it finds them"). Thus, PHL's retention of the premiums is the status quo, which will not be disturbed unless Bank of Utah were to succeed on its unjust enrichment claim. See Penn Mut. Life Ins. Co. v. Greatbanc Trust Co., 887 F. Supp. 2d 822, 832 (N.D. Ill. 2012) (stating insurer's retention of premiums from policy lacking insurable interest was status quo, but that policyholder may seek return of premiums under unjust enrichment claim).

Bank of Utah argues a triable issue exists on its unjust enrichment claim. In support of its claim it asserts PHL was never at risk of having to pay a contractual benefit, reviewed and approved the CFC premium finance program used to finance the Policy, and failed to perform the minimal due diligence necessary to uncover facts that PHL now claims justify voiding the Policy. "Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 828, 838 (Minn. 2012). To prove unjust enrichment, "the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W. 2d 302, 306 (Minn. 1996) (quotation omitted). Although the Minnesota Supreme Court has stated that "the term 'unjustly' could mean illegally or unlawfully," First Nat'l Bank of St. Paul v. Ramier, 311 N.W.2d 502, 504 (Minn. 1981), an unjust enrichment claim also applies when it would be unjust to permit a party to retain what it has received. Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992). An unjust enrichment claim may be asserted where a

claimant lacks an adequate remedy at law due to the invalidation of a contract.  See, e.g., Toretta v. Lachinski, No. A12-0779, 2013 WL 491523, at *11 (Minn. Ct. App. Feb. 11, 2013) (affirming unjust enrichment award where claimant lacked breach of contract claim due to district court's invalidation of contract).

There appear to be no published Minnesota or Eighth Circuit cases addressing whether a policyholder may recover premiums paid on a life insurance policy that has been declared void due to lack of an insurable interest.  Courts from other jurisdictions have held that where a life insurance policy has been declared void ab initio, the policyholder no longer has a contractual remedy, and may seek to recover the premiums through an unjust enrichment claim.  See, e.g.; Greatbanc Trust Co., 887 F. Supp. 2d at 832 (finding unjust enrichment claim not precluded by court's ruling that policy is ab initio and allowing claimant opportunity to prove insured's retention of premiums would be inequitable); Carton v. B&B Equities Grp., LLC, 827 F. Supp. 2d 1235, 1246 (D. Nev. 2011) ("Carton I") (stating premiums for policy declared void for lack of insurable interest will not be disgorged unless party paying premiums prevails on unjust enrichment claim).

An insurer may be required to return premiums on a policy that has been declared void for want of an insurable interest if the insurer failed to diligently investigate facts suggesting an insurable interest was lacking.  See, e.g., Pruco Life Ins. Co. v. Brasner, No. 10-8084-CIV, 2012 WL 4364613, at *4 (S.D. Fla. Sept. 21, 2012) (holding triable issue existed as to whether insurer entitled to retain premiums paid by innocent purchaser of policy where insurer may have "turned a blind eye" to facts that, if timely investigated, would have led insurer to challenge the policy's validity before it was sold to innocent purchaser on secondary market).  As one court explains:

> if the insurers were on notice that the policies were issued to
> parties with uninsurable interests, they may be found culpable, and
> at least partially liable for the consideration received from
> Plaintiffs, because they knowingly entered into contracts which
> have now been ruled void ab initio. If the insurers had knowledge
> that the contract could be voided prior to complete performance
> (which in the case of these Policies only could occur upon the
> death of the insured or termination due to nonpayment), then it is
> arguable that any payments received could unjustly enrich the
> insurer.

Carton v. B&B Equities Grp., LLC., No. 2:11-cv-00746, 2013 WL 4875096, at *6 (D. Nev. Sept.

10, 2013) ("Carton II").

In analyzing whether unjust enrichment is appropriate, at least one court has compared

each party's knowledge, if any, of facts that would have put them on notice that the policy being

issued lacked an insurable interest.  See Carton I, 827 F. Supp. 2d at 1247-48.  Where one party

had inquiry notice of the illicit scheme at the time the policy was issued, and the other party was

without similar notice, it would be inequitable to allow the premiums to go to the party with

notice.  Id.

PHL's motion for summary judgment must be denied, because the record shows PHL had

some knowledge of facts that would have put it on notice that the Policy was being procured as a

cover for a wager, and that PHL did not investigate those facts.  The Inspection Report obtained

by PHL prior to issuing the Policy was incomplete and facially inconsistent, as it did not provide

a breakdown of Close's financial information, and showed that Close owned rental property but

earned no rental income.  The Application for the Policy also included red flags, such as showing

the initial premium payment was over 75% of Close's purported income.  Although these facts

should have triggered further inquiries by PHL, there is no evidence that it performed any further

investigation.  Furthermore, PHL knew at the time the Policy was issued that it was a high value

policy on the life of an elderly individual, that it would be owned by the Trust, that the premiums would be paid through CFC's non-recourse financing program, and that the Policy would be pledged as collateral to secure the CFC loan.

In contrast to PHL's inquiry notice, LLAS (the entity that purchased the Policy from New Stream's bankruptcy estate) was not involved in procuring the Policy, and there is no evidence that LLAS had knowledge of facts that would have put it on notice that the Policy was procured under a scheme to circumvent the prohibition against wagering.

Thus, a reasonable jury could find that allowing PHL to retain the Policy premiums paid by LLAS would not be legally justifiable where PHL was never at risk of incurring liability under the Policy and PHL had inquiry notice of the illicit scheme. Therefore, PHL's summary judgment motion on Bank of Utah's Counterclaim for unjust enrichment is denied.

**B. Motions to Exclude**

Both parties have moved to exclude the testimony of expert witnesses. The Motions to Exclude both focus on the experts' opinions as to whether the Policy had an insurable interest at inception. Now that this issue is resolved, and the only remaining issue is whether PHL would be unjustly enriched by retaining the Policy premiums paid by LLAS, many of the arguments proffered in the Motions to Exclude are largely mooted. However, to the extent the experts intend to testify about industry practices and standards for life insurance underwriting, both experts are qualified to testify, and the Court will not exclude them at this time.

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an

> opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

When evaluating the admissibility of expert testimony, a trial court serves as the gatekeeper to ensure the reliability and relevance of the expert testimony offered into evidence. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). "[R]ejection of expert testimony is the exception rather than the rule," and expert testimony should be admitted if it "advances the trier of fact's understanding to any degree." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006).

Defendant's expert, William Hager, is the former Commissioner of Insurance for the State of Iowa, and presently serves as Vice-Chair of the Subcommittee on Insurance and Banking in Florida's House of Representatives. Pl.'s Ex. 25 at 25-26, App. A at 1; Pl.'s Ex. 26 at 12, 19. His experience makes him qualified to opine on custom and practice in the insurance industry, including underwriting. Plaintiff's expert, Dr. Harold D. Skipper, has been an insurance professor for over 25 years, and has focused his academic career on insurance theory and practice, the economics of risk and insurance, and the public policy aspects of insurance. Foresta Decl., Aug. 1, 2013 [Docket No. 141] Ex. 1 ("Skipper Report") at 3-4, 55. He has also published extensively on insurance issues including life insurance products and underwriting. Id. at 4, 57-62. Thus, he is similarly qualified to opine industry custom and practice for life insurance underwriting.

The testimony of both witnesses will assist the trier of fact in understanding terminology, concepts, customs, and practices specific to life insurance underwriting. Therefore, as the Court

explained at oral argument, the experts will not be excluded at this juncture, and issues of relevance or other objections to the experts' testimony will be addressed at trial.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.  PHL's Motion for Summary Judgment [Docket No. 133] is **GRANTED IN PART and DENIED IN PART**.  The PHL life insurance policy bearing the number 97523816 issued on the life of William Close is null and void ab initio due to the lack of an insurable interest at the time of its issuance.  PHL's request for a declaration entitling it to retain all premiums paid on the Policy is denied pending resolution of Bank of Utah's Counterclaim for unjust enrichment.

2.  PHL's Motion to Exclude Expert Testimony [Docket No. 128] is **DENIED**.

3.  Bank of Utah's Motion for Summary Judgment [Docket No. 145] is **DENIED**. Defendant's Counterclaim for breach of contract is dismissed with prejudice.

4.  Bank of Utah's Motion to Exclude Expert Testimony [Docket No. 138] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  November 27, 2013.